# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| KYLE BLAKE, | ) |
| Plaintiff, | ) |
| v. | ) CASE NO. 2:19-CV-00243-RAH-SMD |
| CITY OF MONTGOMERY, | ) |
| Defendant. | ) |

## PLAINTIFF'S SUPPLEMENTAL MEMORNADUM BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff, Kyle Blake, by and through his undersigned counsel of record, pursuant to Rule 56(d) of the Fed.R.Civ.P., and this Court's Order (Doc.38), and files his Supplemental Memorandum Brief in Opposition to the Defendant's Motion for Summary Judgment. The Plaintiff hereinafter refers to Defendant City of Montgomery as ("the City") and/or the Montgomery Fire Department ("MFD").

## I. SUPPLEMENTAL FACTS

**Declaration of Ashley Payton (Plaintiff's Exhibit 9):** Ashley Payton ("Captain Payton") was employed by MFD from 1999 until 2019, and, in 2018, served as Captain at Station 6 and as a supervisor of Lt. Blake, who worked as a medic on "Rescue 90." (Payton Declaration, ¶ 2 and 4). Captain Payton also served on the MFD Peer Support Team and helped firefighters needing assistance addressing many issues, including physical injuries and mental issues. (Payton Declaration, ¶ 3). Although Fire Chief Jordan often spoke about how the MFD was short on manpower, and advised the firefighters that overtime and double shifts (48-hour shifts) would end, the 48-hour shifts continued. (Payton Declaration, ¶ 6).

Captain Payton knew that Lt. Blake had requested a transfer from "Medic 90" due the number of runs each day and due to 48-hour shifts that continued. Captain Payton had also heard Lt. Blake discuss his need to transfer from "Medic 90" with Captain Jonathan Phillips at Station 6. (Payton Declaration, ¶ 9). When a firefighter needed to address a professional or personal issue, he normally followed the chain of command. (Payton Declaration, ¶ 8).

On the morning of August 22, 2018, Captain Payton learned that Lt. Blake had informed District Chief Hackett that he could no longer work the continued 48 hour shifts as a medic. (Payton Declaration, ¶ 6). That same morning, Captain Payton informed Chief Hackett that he had witnessed Lt. Blake at work with a "blank stare," that he was on the Peer Support Team, and that he would "reach out to Lt. Blake." Chief Hackett advised Captain Payton that was a "good idea." (Payton Declaration, ¶ 12).

Later, on the morning of August 22, 2018, Chief Hackett called Captain Payton and informed him that Lt. Blake had the support of the "Command Staff" that included Fire Chief Jordan, Chief of Staff Petrey, Assistant Chief Bozeman and Chief Hackett. Chief Hackett informed Captain Payton that Lt. Blake had not written or signed anything, that Lt. Blake still had his job, and Lt. Blake would be transferred from his medic position. Captain Payton again advised Chief Hackett that he would contact Lt. Blake and offer his assistance as a member of the Peer Support Team. (Payton Declaration, ¶ 13).

However, minutes later, on the morning of August 22, 2018, Chief Hackett again called Captain Payton. This time, Chief Hackett informed Captain Payton, pursuant to specific instructions from Assistant Chief Bozeman, that he must not to contact Lt. Blake, and that Lt. Blake was not allowed to return to work. Chief Hackett offered no explanation for this change regarding Lt. Blake. (Payton Declaration, ¶ 14). After receiving these instructions, Captain Payton

did not know if anyone at the MFD offered or provided Lt. Blake any assistance. (Payton Declaration, ¶ 15).

**Declaration of Tim Petreit (Plaintiff's Exhibit 10):** Tim Petreit ("Petreit") had a long career as a firefighter. From 1994 until 2010, Petreit served with the Prattville Fire Department, and then served with the Montgomery Fire Department ("MFD") from 2011 until 2019. Petreit served the MFD as a firefighter, paramedic and training officer, and had achieved the rank of Lieutenant. (Petreit Declaration, ¶ 2, 3 and 4). While serving with the MFD, the medics made an average of 300-400 runs each month, or between 10 and 20 runs each day, amounting to approximately 85% of the calls responded to by the MFD. (Petreit Declaration, ¶ 10).

MFD personnel were often required to work two straight 24-hour shifts or a "double," also known as Designated Overtime or "DOT." This was used to avoid personnel shortages, and was compounded by the fact that the MFD was chronically short-staffed, especially medics, similar to Lt. Kyle Blake. (Petreit Declaration, ¶ 11). While Petreit was employed with the MFD, Fire Chief Jordon understood that firefighters were required to work these "double" or 48-hour shifts. However, little, if any, effort was made by the MFD administration to spread the burden more equitably or address the problem. (Petreit Declaration, ¶ 12).

Petreit also served on the MFD Peer Support Team that offered "initial assistance and support to firefighters that may need help coping with many different issues, such as difficult emergency runs, acute stress, severe burnout, PTSD symptoms, physical threats, and other emotional issues." (Petreit Declaration, ¶ 5). The Peer Support Team regularly discussed these issues, including burnout and potential PTSD, and considered strategies for recognition, mitigation and prevention. (Petreit Declaration, ¶ 5). Although the MFD was publicly supportive of the Peer

3

Support Team, the MFD also created the appearance that "admitting a problem and accepting help could adversely affect one's career. (Petreit Declaration, ¶ 6).

The Peer Support Team had numerous discussions concerning experienced and potential burnout of firefighters assigned to medics and ways to help the MFD deal with it, including a decrease in run volume (increased personnel), or to rotate firefighters out of medics for a period of recovery. (Petreit Declaration, ¶ 9). The MFD occasionally granted a requested or recommended transfer, but often returned the firefighter to the previous position due to inadequate staffing or other undisclosed reasons. (Petreit Declaration, ¶ 9). The normal process for providing Peer Support was to meet with the firefighter or crew needing assistance, notify the appropriate individuals, including the District Chief, and provide feedback and make recommendations for the safety and well-being of the firefighter. This included "immediate time off, temporary assignment transfer, or referral for a medical evaluation." (Petreit Declaration, ¶ 8). The District Chief would then be expected to provide this information, through the chain of command, to those with authority to the Fire Chief or an Assistant Chief. (Petreit Declaration, ¶ 8).

**Declaration of Justin M. Smith (Plaintiff's Exhibit 11):** Justin M. Smith ("Lt. Smith") is employed by the MFD as a Lieutenant and, in 2018, worked with Lt. Blake as a medic at Station 10. (Smith Declaration, ¶ 2). According to Lt. Smith, the medics at Station 10 made between 300 and 600 runs each month, and were required to work overtime or two 24-hour shifts. (Smith Declaration, ¶¶ 3 and 4). On the morning of August 22, 2018, Lt. Smith overheard Lt. Blake inform District Chief Hackett that he did not believe his was able to continue to work repeated 48-hour shifts. (Smith Declaration, ¶ 5). On the morning of August 22, Lt. Smith agreed to work Lt. Blake's overtime shift. Lt. Smith understood that if a medic held to work overtime could find

4

someone of equal rank to cover the shift, he would not be penalized of reprimanded of doing so. (Smith Declaration, ¶ 6).

On the morning of August 22, Lt. Smith advised Chief Hackett that Lt. Blake was severely burned out due to the burdensome number of runs, the repeated 48 hour shifts and lack of down time to rest in between. (Smith Declaration, ¶ 6). Chief Hackett told Lt. Smith that he did not believe Lt. Blake was past the point of no return, and the Command Staff would be providing the help he needed. Chief Hackett also informed Lt. Smith to keep him informed of any others who had reached that degree of burn out. (Smith Declaration, ¶ 7).

On August 24, 2018, when Lt. Blake returned to work for normal duty, Assistant Chief Bozeman called the station phone and Lt. Smith answered. Chief Bozeman asked to speak to Lt. Blake. Lt. Smith remained in the room with Lt. Blake and overheard Chief Bozeman speaking very loudly. When the call ended, Lt. Blake informed Lt. Smith that Bozeman was sending someone to escort Lt. Blake off the property. Within 30 minutes, Captain Woods arrived at Station 10, asked Lt. Blake to gather his belongings, and that he had been instructed to escort Lt. Blake off the property. (Smith Declaration, ¶ 8).

Lt. Smith is unaware of any assistance provided Lt. Blake by the MFD due to his burnout and fatigue resulting from the continuous overtime and 48-hour shifts. (Smith Declaration, ¶ 9). However, not long after August 24, 2018, the MFD held a mandatory drill on PTSD. The MFD also introduced a "DOT" list. This list was to hopefully reduce the frequency of individual overtime and equally distribute the overtime department wide. (Smith Declaration, ¶ 10).

**Declaration of Todd Wilson (Plaintiff's Exhibit 12):** Todd Wilson ("Capt. Wilson") is employed by the MDF, and in 2018, served as Captain over Lt. Blake at Station 10. (Wilson Declaration, ¶¶ 2 and 3). When Capt. Wilson arrived at Station 10 on the morning of August 22,

2018, he learned that Lt. Blake had informed Chief Hackett that he could not handle working overtime and 48-hour shifts as a medic anymore. (Wilson Declaration, ¶ 8). At that time, Capt. Wilson approached Lt. Blake and noticed that he was burned out, in a very emotional state, and upset. (Wilson Declaration, ¶ 9). Capt. Wilson advised Lt. Blake that he understood his emotional state, and that he should take some time off before making a final decision about what he thought he needed to do. (Wilson Declaration, ¶ 10).

Shortly thereafter, on the morning of August 22, 2018, Capt. Wilson called Chief Hackett and informed him that he had spoken to Lt. Blake, that Lt Blake had been severely burned out, was very upset and emotional, and that Lt. Blake had not made a rational or final decision about his job with the MFD. (Wilson Declaration, ¶ 11). Chief Hackett agreed, and told Capt. Wilson that Lt. Blake had the support of the "Command Staff," that Lt. Blake could be transferred for the relief he needed, and that Lt. Blake "was not past the point of no return." (Wilson Declaration, ¶ 12). Later that day, Capt. Wilson again talked to Lt. Blake and informed him what Chief Hackett had said about getting the support and relief he needed, and that he "was not past the point of no return." (Wilson Declaration, ¶ 13).

Several days later, Capt. Wilson was "shocked" to learn that Assistant Chief Bozeman had instructed Lt. Blake not to return to work. (Wilson Declaration, ¶ 14). After speaking with Chief Hackett on August 22, 2018, Capt. Wilson is unaware of anyone from the MFD who offered or provided any assistance to Lt. Blake. (Wilson Declaration, ¶ 15).

## II. LAW AND ARGUMENT

### A. FMLA - SUFFICIENT NOTICE

As stated in Plaintiff's initial brief, when the employee "gives sufficient notice to his employer that <u>potentially FMLA-qualifying leave is needed</u>, the employer <u>must</u> then ascertain

6

whether the employee's absence actually qualifies for FMLA protection." *Wai v. Fed. Express Corp.*, 461 Fed. Appx. 876, 882 (11th Cir. 2012); *Cruz v. Publix Super Markets, Inc*., 428 F.3d 1379, 1383 (11th Cir. 2005) (citing *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1209 (11th Cir. 2001); (citing 29 C.F.R. § 825.303(b)(Emphasis added). In the case of unforeseeable need to take FMLA-qualifying leave, "an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). Depending on the situation, such information may include that a condition that renders the employee unable to perform the functions of the job[.]" 29 C.F.R. § 825.303(b). "As a general rule, an employee need not explicitly mention the FMLA when giving notice to h[is] employer." *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1196 (11th Cir. 2015) (citing 29 C.F.R. § 825.303(b)).

"Adequacy of notice is consistently regarded as a finding of mixed fact and law. 'The question of whether notice was given, and if so, what the notice consisted of and when it was given, is one of fact.'" *Smith v. Constr. Datafax, Inc.*, 871 F. Supp. 2d 1226, 1237 (N.D. Ala. 2012) (quoting *Cavin v. Honda of Am. Mfg*., 346 F.3d 713, 725 (6th Cir. 2003)). "There are no categorical rules governing the content of notices - i.e. what is sufficient to put an employer on notice and what is not," and an employee is not required to utter "magic words." *Smith*, 871 F. Supp. 2d at 1236. All that is required is "<u>enough information to put the employer on notice that an event described in the FMLA may have occurred</u>." Id. (citing *Cruz*, 428 F.3d at 1383-84)(Emphasis added). Verbal notice can be sufficient, 29 C.F.R. §§ 825.302(c), 825.303(b); See *Cruz*, supra, at 1383-84; *Woods v. DaimlerChrysler Corp*., 409 F.3d 984 (8th Cir. 2005); and *Cavin v. Honda of Am. Mfg*., 346 F.3d 713 (6th Cir. 2003).

The employee does not need to expressly assert rights under the FMLA, or even mention the FMLA, so long as the employee conveys enough information to put the employer on notice that an event described in the FMLA may have occurred. See *Cruz*, 428 F.3d at 1383-84 (citations omitted). There are no categorical rules governing the content of notices - i.e. what is sufficient to put an employer on notice and what is not - instead courts recognize that "[w]hat is practicable, both in terms of the timing of the notice and its content, <u>will depend upon the facts and circumstances of each individual case</u>." *Smith*, supra, at 1236 (citing *Cavin v. Honda of Am. Manufacturing, Inc*., 346 F.3d 713, 724 (6th Cir. 2003) (quoting *Manuel v. Westlake Polymers Corp*., 66 F.3d 758, 764 (5th Cir. 1995)). (Emphasis added).

Taking into consideration all of the facts, including the additional pertinent information presented in the Declarations of two former MFD firefighters, Ashley Payton and Tim Petreit, and Lt. Smith and Captain Wilson, there exists a jury question of whether the MFD was with sufficient notice that Lt. Blake needed potentially FMLA-qualifying leave. According to Tim Petreit, the MFD was well aware of how the "double" 48-hour shifts caused medics to suffer acute stress, severe burnout, PTSD, or other physical and mental issues. The MFD had provided other firefighters and medics "immediate time off, temporary assignment transfer, or referral for a medical evaluation." The MFD Peer Support Team had regularly discussed issues, including burnout and potential PTSD, and offered strategies for recognition, mitigation and prevention. (Petreit Declaration, ¶ 5)(Ex. 10).

In addition the MFD Peer Support Team had received training and followed the MFD procedure acknowledged by Chief Jordan. (Jordan Dep. 37:2–8) (Ex. 4). After contacting and meeting with the firefighter, Peer Support notified appropriate individuals, including the District Chief, and made recommendations for the safety and well-being of the firefighter. The District

8

Chief then provided this information, through the chain of command, to the Fire Chief or an Assistant Chief. (Petreit Declaration, ¶ 8)(Ex. 10).

With the MFD's understanding of the 85% number of runs made by medics, the excessive overtime ("double" or 48-hour shifts) worked, the assistance provided by the trained and certified Peer Support Team, including meetings, recommendations and relief offered by the Support Team, the MFD had more than sufficient notice that medics, such as Lt. Blake, could need potentially FMLA-qualifying leave. As reported by the Montgomery Advertiser, the City's Director of Public Safety Ronald Sams acknowledged the MFD's excessive overtime and its potential harmful and dangerous effects on firefighters and medics. Montgomery Advertiser, Sept. 6th, 2018. (Ex. 3)

In this case, Lt. Blake had previously requested a transfer from his medic unit, and the MFD and Fire Chief had approved this transfer. (D00094)(Ex. 1). When this authorized transfer never occurred, Lt. Blake repeatedly discussed with his supervisors his need to transfer from the overwhelming demands of his medic position on "Rescue 90." (Payton Declaration ¶¶ 9 and 10)(Ex. 9). On the morning of August 22, 2018, when Lt. Blake learned that he was being assigned to work <u>back-to-back "double" 48-hour shifts</u> (August 21 – 22; and August 24- 25), he informed District Chief Hackett that he could not do these 48-hour shifts anymore. (Blake Dep. pp. 54:18 through 55:15)(Ex.2); (Smith Declaration, ¶ 5)(Ex. 11); (Wilson Declaration, ¶ 8)(Ex. 12).

Lt. Blake had completed his scheduled 24-hour shift on August 21, and made sure the 24-hour overtime shift for August 22 was covered. (Blake Dep. p.59:2-13). Lt. Smith agreed to work Lt. Blake's overtime shift, and understood Lt. Blake would not be penalized of reprimanded. (Smith Declaration, ¶ 6)(Ex. 11). Capt. Wilson, Lt. Blake's supervisor, noticed Lt. Blake was burned out, in a very emotional state, and upset. (Wilson Declaration, ¶ 9)(Ex. 12). Capt. Wilson advised Lt. Blake he understood his emotional state, and he should take some time off before

9

making a final decision about what he thought he needed to do. (Wilson Declaration, ¶ 10)(Ex. 12).  On the morning of August 22, both Capt. Wilson and Lt. Smith also informed Chief Hackett how Lt Blake had been severely burned out, and was very upset and emotional due to the burdensome number of runs, repeated 48 hour shifts and lack of down time to rest between runs. (Smith Declaration, ¶ 6)(Ex. 11); (Wilson Declaration ¶¶ 11 and 12)(Ex.12).

Chief Hackett informed Capt. Wilson and Lt. Smith that Lt. Blake had the support of the Command Staff, he was "not past the point of no return," and the Command Staff would be providing Lt. Blake the help he needed. (Smith Declaration, ¶ 7)(Ex. 11);(Wilson Declaration, ¶ 12)(Ex.12).

That same morning, on August 22, 2018, Chief Hackett wrote a Memorandum to Assistant Chief Bozeman, specifically explaining in paragraphs 2 and 3 of this memorandum he had learned about how Lt. Blake was suffering from severe burnout, and Captain Payton, from the Peer Support Team, was going to contact Lt. Blake. Chief Hackett also documented Lt. Blake was not at a "point of no return," and "once he settles down and begins to think about the situation," Lt. Blake would have "the support of the Command Staff." (D000045-46) (Ex. 1). Captain Payton informed Chief Hackett he also had witnessed Lt. Blake with a "blank stare," and was going to "reach out to Lt. Blake."  Chief Hackett agreed, stating this was a "good idea." (Payton Declaration, ¶ 12)(Ex.9), (D000045-46) (Ex. 1).

Later that morning, on August 22, 2018, Chief Hackett called Captain Payton and informed him Lt. Blake had the support of the "Command Staff," Lt. Blake had not written or signed anything, and still had his job, and Lt. Blake would be transferred from his medic position. Captain Payton again advised Chief Hackett he would contact Lt. Blake. As a member of the Peer Support Team, Captain Payton reiterated to Chief Hackett he would contact Lt. Blake and offer his

assistance. (Payton Declaration, ¶ 13)(Ex. 9). In another telephone conversation later that same day, Chief Hackett also advised Lt. Blake he had the "Command Staff's support". (Blake Dep. 62:9 – 65:20) (Ex 3).

To reiterate, the City was well aware of MFD firefighters and medics working excessive overtime and 48-hour shifts, and how this was causing many to suffer acute stress, severe burnout, PTSD symptoms, and other physical and/or emotional issues. (Petreit Declaration, ¶ 5)(Ex. 10). More importantly, on the morning of August 22, 2018, the MFD learned, both verbally and in writing, how Lt. Blake was experiencing severe "burnout" or fatigue, and was in a possible unstable emotional or dangerous condition. The MFD Peer Support Team was prepared to assist. The MFD had "sufficient notice" of Lt. Blake's need for potentially FMLA-qualifying leave.

### B. CITY'S BURDEN UPON RECEIVING SUFFICIENT NOTICE

When the employee "gives sufficient notice to his employer that *potentially* FMLA-qualifying leave is needed, the employer must then ascertain whether the employee's absence actually qualifies for FMLA protection." *Wai v. Fed. Express Corp.*, 461 Fed. Appx. 876, 882 (11th Cir. 2012)., Cruz, 428 F.3d at 1383 (citing *Strickland*, supra at 1209 (citing 29 C.F.R. § 825.303(b))(Emphasis added). When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances. 29 C.F.R. § 825.300(b)(1) (emphases added). ). Once such notice is given, the burden is on the employer to "ascertain whether the employee's absence actually qualifies for FMLA protection." *Cruz*, 428 F.3d at 1383. (Emphasis added).

In this case, the facts reveal both the actions taken, and responsibilities ignored, after the MFD received sufficient notice concerning Lt. Blake on the morning of August 22, 2018. As represented in Plaintiff's initial Brief (Doc.33, pp. 7-8), Fire Chief Miford Jordan reviewed Chief Hackett's Memorandum. (Jordan Dep. 28:10-17) (Ex. 4). Chief Jordan took no action to determine Lt. Blake's physical or mental condition by speaking to Lt. Blake or to anyone else. (Jordan Dep. 29:10 – 30:16) (Ex. 4). According to Chief Jordan, that was not his responsibility. (Jordan Dep. 34:6–17) (Ex. 4). However, Chief Jordan acknowledged the Peer Support Team: "Anyone that has burnout has an issue mentally … and there was a "peer group, which is members that's been trained, certified by agency <u>to help our personnel with any issues and make recommendations to supervisors</u>." (Jordan Dep. 37:2–8) (Ex. 4)(Emphasis added).

Nonetheless, Chief Jordan knew of no action taken help Lt. Blake. (Jordan Dep. 37:9–22) (Ex. 4); and expressed no opinion about whether Lt. Blake needed the relief referenced by Chief Hackett. (Jordan Dep. 52:5–15) (Ex. 4). Chief Jordan left any decisions and how to "deal with [Lt. Blake's] situation" with Chief of Staff Petrey, Assistant Chief Bozeman and Chief Hackett, (Jordan Dep. 54:2–21) (Ex. 4). Chief Bozeman had the authority <u>to address each issue</u> raised in Chief Hackett's memorandum concerning Lt. Blake and written on the morning of August 22. (Jordan Dep. 66:2-10) (Ex. 4)(Emphasis added).

With more than sufficient notice of Lt. Blake's potentially FMLA-qualifying need, and with the trained Support Team ready to address and determine Lt. Blake's serious condition, Assistant Chief Bozeman simply ignored the City's responsibilities. As confirmed by Captain Payton of the Peer Support Team: "Chief Hackett informed me that Assistant Chief Bozeman had given him specific instructions that <u>I must not contact Lt. Blake and that Lt. Blake was not allowed to come back to work</u>." (Payton Declaration, ¶ 14)(Ex.9). (Emphasis added).

12

On August 24, 2018, when Lt. Blake returned to work for normal duty, Assistant Chief Bozeman sent Captain Woods to Station 10, with instructions to escort Lt. Blake off the property. (Smith Declaration, ¶ 8). Capt. Wilson was "shocked" to learn Assistant Chief Bozeman had instructed Lt. Blake not to return to work. (Wilson Declaration, ¶ 14)(Ex.12). Captain Wilson and Lt. Smith confirmed they knew of no assistance provided Lt. Blake by the MFD due to his burnout and fatigue resulting from the continuous overtime and 48-hour shifts. (Smith Declaration, ¶ 9)(Ex. 11); (Wilson Declaration, ¶ 15)(Ex.12). However, soon after August 24, 2018, the MFD held a mandatory drill on PTSD; and also introduced a "DOT" list in an effort to reduce the frequency of individual overtime and equally distribute overtime department wide. (Smith Declaration, ¶ 10).

All of these significant facts further clarify the City's failure to "ascertain whether Lt. Blake qualified for FMLA protection." *Cruz*, supra, at 1383. This evidence also reveals how the City intentionally elected to ignore and avoid its responsibilities as Lt. Blake's employer under the FMLA. The City expressly prohibited the Peer Support Team, Captain Payton or others from contacting Lt. Blake to ascertain his condition and need for leave or medical assistance. Rather than allow trained and certified members of the Support Team to meet with Lt. Blake, evaluate his physical and mental state, and make informed recommendations to the District Chief for his safety and well-being, the City immediately disregarded Lt. Blake's *potential* FMLA protections, merely asserting Lt. Blake was no longer employed. On the morning of August 24, 2018, when Lt. Blake returned to Station 10 in an effort to serve his scheduled shift, the MFD engaged in further humiliation, ordering Lt. Blake's removal from the property in front of his fellow firefighters. (Smith Declaration, ¶ 8)(Ex. 11).

## III. CONCLUSION

The Plaintiff adopts and incorporates herein each of the facts and legal arguments made in the Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment. (Doc.33). The Plaintiff asserts that the additional facts and argument presented to the Court pursuant to Rule 56(d) and this Court's Order (Doc. 38), further document and clarify each of Plaintiff's claims: FMLA Interference, FMLA Retaliation, and the City's failure to provide Lt. Blake notice and a hearing in violation of his Constitutional Right to Procedural Due Process.

The Plaintiff respectfully maintains the Defendant has not met its initial burden of adequately representing the absence of a genuine issue of material fact as to each of Plaintiff's claims. Moreover, in opposing the Defendant's Motion, the Plaintiff respectfully asserts he has presented specific facts establishing a genuine issue of fact as to each of his claims. For the foregoing reasons, the Defendant's Motion for Summary Judgment must be denied.

Respectfully submitted,

/s/ K. David Sawyer
K. David Sawyer
516 S. Perry Street, Suite 3-D
Montgomery, AL 36104
Telephone: (334) 356-4301
Facsimile: (334) 263-2321
kdsawyer64@outlook.com
Counsel for Plaintiff Kyle Blake


/s/ Julian L. McPhillips, Jr.
JULIAN L. McPHILLIPS, JR.
McPhillips Shinbaum, LLP
516 S. Perry Street  Montgomery, AL 36104
Telephone: (334) 262-1911
Facsimile: (334) 263-2321
julianmcphillips@msg-lawfirm.com
Counsel for Plaintiff Kyle Blake

# CERTIFICATE OF SERVICE

I certify that on this 20th day of April, 2020, I have served a copy of the above Plaintiff's Supplemental Brief in Opposition to the Defendant's Motion for Summary Judgment on the following counsel for the named Defendant:

Christopher R. East
City of Montgomery
City Attorney's Office
PO Box 1111
Montgomery, Alabama, 36101
(334) 625-2050 telephone
(334) 625-2310 facsimile
ceast@montgomeryal.gov

/s/ K. David Sawyer
K. David Sawyer
Counsel for Plaintiff, Kyle Blake