IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KYLE BLAKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-243-RAH |
| | ) | (WO) |
| THE CITY OF | ) | |
| MONTGOMERY, ALABAMA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Does telling your employer that, due to burnout, you "couldn't do it anymore" and that you "would turn [your] stuff in if [you] needed to" support a claim under the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA") when your employer ultimately accepts these statements as your voluntary resignation from your job?  (Doc. 29-1 at 54, 82.)  Plaintiff Kyle Blake claims that it does, and this lawsuit tests the legitimacy of that position.

## I.    BACKGROUND

Blake formerly was employed as a paramedic by the City of Montgomery ("the City") in its fire department ("the Department").  Blake began his employment with the Department in 2012, (Doc. 29-1 at 27), and became a certified paramedic in 2014, (Doc. 32-1 at 20).  Prior to the events of August 22, 2018, Blake was an otherwise exemplary firefighter and paramedic. (*See* Doc. 32-1 at 19, 23-24.)

1

### A. The Handbook and Previous FMLA Leave

As an employee of the City, Blake received a copy of the City of Montgomery Employee Handbook and a separate document titled "City of Montgomery Benefits and Policies." (Doc. 29-1 at 45-47; Doc. 32-8.) The handbook provided, *inter alia*, that merit employees like Blake had certain protections, including a right to a hearing regarding disciplinary action. (Doc. 32-8 at 6-7.) The handbook also contained instructions about the City's Employee Assistance Program ("EAP"), which was established to help employees who are "experiencing medical/behavioral problems." (Doc. 32-8 at 2.) As described in the handbook, managers and other supervisors could refer an employee to the EAP to improve "job performance or job management issues." (Doc. 32-8 at 2.)

The employee handbook also contained instructions regarding how employees must request FMLA leave. (Doc. 32-8 at 8.)  To request FMLA leave, an employee must "give 30 days' advance notice to their supervisors," or "(i)f the need for leave is unforeseeable…employees must inform the department head as soon as they are aware of the need for leave, but no less than five business days from the beginning of their absence, unless an emergency situation exists…in which case the department head must be informed as soon as practicable." (Doc. 32-8 at 8.) The policy further provided that "(e)mployees will receive a Request for Family and Medical Leave form to complete and submit to the department head." (*Id.*)

Blake never requested assistance from the EAP. (Doc. 29-1 at 48.)   Blake however did invoke the FMLA leave-request procedures in February 2018 when he took FMLA leave for carpal tunnel surgery. (Doc. 29-1 at 49.)  To do so, he informed the Department and completed the appropriate FMLA paperwork. (Doc. 29-1 at 49.)

### B. Blake's Work Hours

Blake and other paramedics had to work significantly more hours than other personnel at the Department. While a regular firefighter might make "between 14 and 38 runs" per month, paramedics like Blake made "between 350 to 400 runs" per month. (Doc. 29-1 at 42-43.)

Due to short staffing, Blake and other paramedics often were required to work 48-hour shifts, which were contrary to the rules and regulations of the Department. (Doc. 32-7; Doc. 33 at 3.) The staffing issues were so dire that *The Montgomery Advertiser* published an article on September 6, 2018, that quoted a city representative as saying that the City was aware of the fatigue issues among its EMT personnel who were having to work double shifts. (Doc. 32-3.)

### C. The Resignation Event

On August 21, 2018, Blake began work on his regularly scheduled 24-hour shift, from 8:00 A.M. to 8:00 A.M. (Doc. 29-1 at 52-53.)   The following morning, prior to finishing his assigned shift, the supervisor for the next shift, District Chief B.S. Hackett, informed Blake that he had to work the next 24-hour shift (an overtime

shift) also. (Doc. 29-1 at 54.) In response, Blake told Hackett that he "couldn't do it anymore" and "[t]hat I would turn my stuff in if I needed to, something like that." (Doc. 29-1 at 54, 82.) Blake concedes that his statements to Hackett meant that he was leaving his employment with the Department:

> Q.    Then why mention turning your gear in?
>
> A.    Because that's what you do when you leave.
>
> Q.    When you leave?
>
> A.    Uh-huh (positive response).
>
> Q.    When you leave employment or when you leave for the day?
>
> A.    When you leave employment, you turn your stuff in.

(Doc. 29-1 at 82.)

Blake obtained coverage for the overtime shift before he left for home. (Doc. 29-1 at 59.)   According to an affidavit[1] submitted by Lt. Justin Smith, another paramedic, Smith agreed to work Blake's overtime shift, and according to Smith, "(i)t is understood that if we are held overtime and we can find someone of equal rank to cover that shift then we will not be penalized or reprimanded for doing so."

---

[1] Several affidavits were submitted by Blake after the Court granted Blake's motion to supplement his summary judgment response. (*See* Doc. 38; Doc. 39.) The City has requested that certain portions of these affidavits be disregarded or stricken. (Doc. 42 at 2.)  Since these statements are not central to the Court's disposition of the City's summary judgment motion, the request is moot.

(Doc. 39-3 at 1.)  Smith also "informed Chief Hackett that Lt. Blake was severely burned out due to the burdensome number of runs, the repeated 48 hour shifts and lack of downtime to rest in between." (Doc. 39-3 at 1.)

Hackett then drafted a memorandum summarizing the events of that morning. (Doc. 32-1 at 1.) The memo explained that Blake had tendered his resignation but staff believed that Blake's resignation was not a permanent decision since Blake had been "severely burned out lately." (Doc. 32-1 at 1.)  The memo contained Hackett's personal opinion that Blake was not past a "point of no return" and that once Blake settled down, the command staff would move Blake to a less taxing position that week. (Doc. 32-1 at 1.)    The memo concluded with a statement that Hackett expected to speak with Blake again that afternoon.  (Doc. 32-1.)

Blake attempted to call Hackett later that morning to inform him that he was not being rude or disrespectful earlier that morning. (Doc. 29-1 at 60-61; Doc. 29-4 at 1.) Because Hackett was pre-occupied with other matters, Blake left a message requesting that his apology be passed on to Hackett. (Doc. 29-1 at 61; Doc. 29-4 at 1-2.)

Blake called again later that afternoon and finally spoke with Hackett. (Doc. 29-1 at 62.) During their conversation, Hackett said that he was unaware  that Blake had "gotten burned out that bad" but he reassured Blake that he was "not past the point of no return." (Docs. 29-1 at 62-63.)  Blake however did not retract his prior

statements; instead, he said that he needed to speak with his wife to "figure this out." (Doc. 29-1 at 63.)  At some point during the conversation, the term "burnout" was used, but Blake did not otherwise state that he was experiencing any mental health or other medical issues. (Doc. 29-1 at 72.)

Blake left the conversation unsure as to whether, if he reported to work two days later on August 24 for his next scheduled shift, he still had a job with the Department. (Doc. 29-1 at 65.) But he believed that if he showed up, the Department would work something out, such as giving him a break by taking him out of the paramedic rotation. (Doc. 29-1 at 65.) Blake also thought the Department would refer him to the EAP as outlined in the handbook. (Doc. 29-1 at 74.)

Later that day, Hackett and Assistant Fire Chief R.H. Bozeman spoke about Blake and his situation.  (Doc. 39-1 at 3.)  During the conversation, Bozeman instructed Hackett not to contact Blake because Blake would not be allowed back to work. (Doc. 39-1 at 3.)

The next day, Bozeman contacted Blake and told him that his verbal resignation had been accepted and that he needed to turn in his gear to the Department's supply division. (Doc. 29-1 at 68.)  While Blake claims that he was surprised by the call, he responded with "10-4 Chief" before Bozeman ended the phone call. (Doc. 29-4 at 2.)

Bozeman and Blake spoke again later that evening, during which Bozeman confirmed that Blake should turn in his gear the next day but that Blake could request a meeting with Chief Jordan if he wanted to. (Doc. 32-1 at 5.) Following the call, Bozeman sent a memorandum to E.D. Gauntt, Chief of Operations, stating that Blake had tendered his resignation to Hackett and that Bozeman had spoken with Blake to inform him that he needed to turn in his equipment. (Doc. 32-1 at 14.)

Despite the call with Bozeman, Blake nevertheless decided that he would simply return to work the next day because, otherwise, a failure to report would guarantee his "termination/resignation." (Doc. 29-4 at 2.)  When Blake returned to work, he was instructed not to get on the truck for duty, that he should turn in his gear, and that he should leave the property. (Doc. 29-3; Doc. 29-4 at 2.) Blake responded that he had broken no rules and was reporting for duty, and he further requested confirmation in writing that he was no longer employed by the Department. (Doc. 29-3.) Blake then turned in his gear and left the station.  The City documented the departure on August 28, stating that Blake had resigned "NOT in good standing." (Doc. 32-1 at 12.)

Blake filed suit on April 4, 2019. (Doc. 1.)  In his Complaint, Blake claims that the City violated FMLA and his due process rights under the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983.

## II.    JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617. Personal jurisdiction and venue are uncontested, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## III.    STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).

On the other hand, a court ruling on a motion for summary judgment must draw all justifiable inferences from the evidence in the non-moving party's favor. *E.g*., *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (the evidence and all reasonable inferences from the evidence must be viewed in the light most favorable to the nonmovant). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c).

The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor. *Chapman v. AI Transp*., 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting

*Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (internal marks and citations omitted)).

## IV.   DISCUSSION

### A. The FMLA Claims

As it concerns his departure, Blake invokes both an FMLA interference and a retaliation claim.  *See Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (noting that FMLA creates two distinct types of claims: interference claims and retaliation claims). An FMLA interference claim arises when "an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act," and a retaliation claim arises when "an employee asserts that his employer discriminated against him because he engaged in activity protected by [the FMLA]...." *Id.* (citing 29 U.S.C. §§ 2615(a)(1), (2); 29 C.F.R. § 825.220(c)).

The City claims that it is entitled to summary judgment on both.  The Court agrees.

### 1.  <u>The FMLA Interference Claim</u>

To establish an FMLA interference claim, the employee "need only show that his employer interfered with or denied him an FMLA benefit to which he is entitled." *Leach v. State Farm Mut. Auto. Ins. Co*., 431 F. App'x 771, 776 (11th Cir. 2011); *see also Martin v. Brevard County Pub. Sch*., 543 F.3d 1261, 1266-67 (11th Cir.

2008). The employer's motivation is immaterial. *See Strickland*, 239 F.3d at 1208.

"An interference claim has two elements: (1) the employee was entitled to a benefit

under the FMLA; and (2) her employer denied her that benefit." *White v. Beltram*

*Edge Tool Supply, Inc*., 789 F.3d 1188, 1191 (11th Cir. 2015). "The first element

identified in *White* subsumes several sub-elements," including "(1) that the

defendant is a covered entity; (2) that the plaintiff is eligible for FMLA benefits; (3)

that the plaintiff sought leave for a qualifying reason; and (4) that the plaintiff

provided notice meeting certain criteria." *Moore v. GPS Hosp. Partners IV, LLC*,

383 F. Supp. 3d 1293, 1297, n.1 (S.D. Ala. 2019) (citing Eleventh Circuit Pattern

Jury Instructions (Civil) 4.16 (2013)); *see also Willmore-Cochran v. Wal-Mart*

*Associates, Inc*., 919 F.Supp.2d 1222, 1243 (N.D. Ala. 2013); *Sanderson v. Country*

*Club of Birmingham*, No. CV 07-AR-2192-S, 2009 WL 10703243, at *7 (N.D. Ala.

Feb. 18, 2009) (Acker, J.).

The Parties do not dispute that Blake was an eligible employee or that the City

is an employer covered by the FMLA. But the Parties do dispute whether Blake was

entitled to and sought FMLA leave and whether the City had notice of Blake's need

to take leave. (Doc. 30 at 6-7.)

### a. *FMLA Qualifying Condition*

According to Blake, his FMLA qualifying condition (or potential condition)

was "burn out or chronic fatigue" and "the City, and even Director of Public Safety,

Ronald Sams, were with sufficient notice of the detrimental effect of 48-hour shifts,"

(Doc. 33 at 14), that could cause this condition, (Doc. 33 at 15).  This knowledge of

the hazards synonymous with the job of a paramedic therefore provided the City

with notice "that it needed to conduct further investigation into whether Lt. Blake

was eligible for FMLA leave." (Doc. 33 at 14.)  Blake advances this "you should

have known" argument while acknowledging that he never requested FMLA leave

from the City prior to or at the time of his departure.  (Doc. 33 at 14-15.)

The City disputes these points, arguing that, aside from not asking for leave,

Blake did not have a qualifying condition under the FMLA.  Upon reviewing the

record, the Court agrees.

To qualify for FMLA leave, Blake must show that he had a "serious health

condition" that made him "unable to perform the functions of [his] position ...." 29

U.S.C. § 2612(a)(1)(D). An employee has a "serious health condition" if: (1) the

employee is incapacitated, meaning unable to work, for more than three consecutive,

full calendar days; and (2) the employee is receiving "treatment by a health care

provider on at least one occasion, which results in a regimen of continuing treatment

under the supervision of the health care provider." 29 C.F.R. §§ 825.113(a)-(b);

825.115(a)(2).  *See Martin v. Financial Asset Management Systems, Inc*., 959 F.3d

1048, 1052 (11th Cir. 2020) (explaining the serious health condition inquiry under

FMLA); *Pivac v. Component Services & Logistics, Inc.*, 570 F. App'x 899, 903 (11th Cir. 2014).

From the record before the Court, Blake has not shown that he had a serious health condition that triggered FMLA, let alone entitled him to FMLA leave on August 22, 2018. There is no evidence in the record showing that Blake had been diagnosed with any qualifying illness or condition (or, for that matter, that he has ever been subsequently diagnosed), whether that be for Post-Traumatic Stress Disorder ("PTSD") or otherwise. While Blake repeatedly uses the term "PTSD" throughout his pleadings filed in this case, he presents no evidence confirming such a medical diagnosis, or some other condition, on August 22 or thereafter.

Blake even admits that he had not been diagnosed for any medical condition prior to the events of August 22, 2018. (Doc. 29-1 at 83-84.) He further admits that he did not discuss a medical condition with any of his superiors. (Doc. 29-1 at 88.)

Blake only offers that he started visiting an unnamed "licensed counselor" after the events of August 22. (Doc. 29-1 at 84-87.) This threadbare record does not demonstrate that Blake suffered from a FMLA qualifying medical condition on August 22, let alone one of which the City, or Blake for that matter, was aware. *See Jean-Bart v. DVA Renal HealthCare, Inc.*, No. 2:12-CV-160-SPC-UA-DNF, 2013 WL 12371818, at *10 (M.D. Fla. Sept. 3, 2013) ("In short, Plaintiff has the initial burden of establishing the elements of [the] FMLA claim, which include

demonstrating a qualifying medical condition that justified [the] absence. Plaintiff's Opposition brief is unresponsive to Defendant's arguments concerning … medical conditions."); *Singletary v. Stops, Inc.*, No. 609-CV-1763-ORL-19KR, 2010 WL 3517039, at *9 (M.D. Fla. Sept. 7, 2010) (citing *Olsen v. Ohio Edison, Co*., 971 F.Supp. 1159, 1166) (N.D. Ohio 1997) (noting that there is no incapacity under the FMLA where it is merely "uncomfortable or inconvenient for the employee to have to work")); *Collins v. NTN-Bower Corp*., 272 F.3d 1006, 1008 (7th Cir. 2001) (stating that "'[s]ick' does not imply a 'serious health condition'"); *see also Niesse v. Gen. Elec. Co*., No. IP99-1457-C-T/G, 2001 WL 290382, at *6 (S.D. Ind. Jan. 31, 2001) (knowledge that an employee has depression and that she had taken a prior leave of absence is insufficient to put an employer on notice that a request for leave for "Personal Problems & Child care issues" is really a request for leave because of a serious health condition of the employee that makes her unable to perform her job).

As best as Blake can describe, even considering the language he used with Hackett on August 22, his condition amounted to only "burnout" or "job fatigue." Job burnout and job fatigue do not constitute FMLA-qualifying medical conditions, especially when they are unaccompanied by any medical evidence, as is the case here.[2] *See, e.g*., *Maitland v. Employease, Inc*., No. CIV.A. 1:05-CV-0661, 2006 WL

---

[2] To the extent Blake attempts to advance a "regarded as" theory, such a theory does not exist in the FMLA context as it does in the ADA context.  *See, e.g*., *Hurlbert v. St. Mary's Health Care Sys., Inc*., 439 F.3d 1286, 1295 (11th Cir. 2006) (quoting

3090120, at *15 (N.D. Ga. Oct. 13, 2006) (plaintiff's statements about feeling "sick," complaining to human resources director that she was "burned out," and that she was seeking counseling for stress, were insufficient to reasonably apprise defendant of plaintiff's request to take time off for a serious health condition as defined by the FMLA); *see also Savard v. Hunte Delivery Sys., Inc*., No. 06-5064-CV-SW-GAF, 2007 WL 9717707, at *6 (W.D. Mo. Oct. 30, 2007) ("burnout" and "stress" are not FMLA-qualifying conditions); *To v. U.S. Bancorp*, No. CIV 08-5979 JRT/JJK, 2010 WL 3546823, at *6 (D. Minn. Sept. 7, 2010), *aff'd*, 651 F.3d 888 (8th Cir. 2011) (employee's explanation for not returning to work was that he was "feeling ill ... tired, lethargic, fatigue-ish ... that [he] needed a few days to recuperate" and that he "was not feeling well," and two return-to-work slips indicating he was out due to "illness" failed to apprise his employer of the specifics of an FMLA-qualifying health condition); *cf.*, *Brock v. United Grinding Techs., Inc*., 257 F. Supp. 2d 1089, 1101 (S.D. Ohio 2003) (discussing the FMLA's legislative history) ("the

---

*Stekloff v. St. John's Mercy Health Sys*., 218 F.3d 858, 861 (8th Cir. 2000) ("there may be some parallels between the ADA and FMLA, but applicable regulations explicitly state that ADA's 'disability' and the FMLA's 'serious health condition' are different concepts, and must be analyzed separately.")); *see also Walker v. Trinity Marine Products, Inc*., 721 F.3d 542, 546 (8th Cir. 2013) ("Though some federal statutes permit an employee who is 'regarded as' impaired by her employer to sue, *see* 42 U.S.C. § 12102, the FMLA makes no provision for claims based on an employer's perception of its employee's health.") (citations omitted).

statute was not intended to create a sick leave policy for temporary or minor illnesses").

Thus, vague after-the-fact assertions that Blake *might* have been suffering from PTSD are not evidence of an FMLA-qualifying condition, and certainly are not sufficient to defeat summary judgment.[3]

True, "neither the FMLA nor its supporting regulations contain any requirement that an employee be diagnosed with a serious health condition before becoming eligible for FMLA leave." *Lore v. Chase Manhattan Mortg. Corp.*, No. 1:04-CV-00204-LTW, 2008 WL 11320016, at *4 (N.D. Ga. Nov. 14, 2008) (citations omitted); *see* 29 C.F.R. § 825.113(c) ("The term treatment includes (but is not limited to) examinations to determine if a serious health condition exists"); *see also Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1436 (11th Cir. 1997) ("Of course, unforseen medical emergencies may make advance notice impossible, and in that case, no rights under the FMLA would be lost."). But Blake has not offered any evidence that he has been subsequently diagnosed with a qualifying medical condition. His failure to do so is fatal to his FMLA interference claim. *Russell v. North Broward Hosp.*, 346 F.3d 1335, 1340 (11th Cir. 2003); *Barker v. R.T.G.*

---

[3] Blake makes no attempt to argue that his claimed condition rendered him unable to work, let alone unable to work for more than three full consecutive days. To the contrary, the record shows, and Blake acknowledges, that he returned to work on August 24 for his next regularly scheduled shift.

*Furniture Corp.*, 375 F. App'x 966, 968 (11th Cir. 2010); *Pride-Fort v. N. Am. Lighting*, No. 3:17-CV-01203-MHH, 2020 WL 1953804, at *6, n.7 (N.D. Ala. Apr. 23, 2020) (the plaintiff's "unsubstantiated suspicion that [she] might have been experiencing a relapse of [a serious medical condition] is insufficient to establish a serious health condition for purposes of the FMLA."); *see generally* 29 C.F.R. § 825.306 (establishing requirements for FMLA medical certification for leave taken because of employee's serious health condition). Accordingly, the City is entitled to summary judgment due to Blake's inability to show a qualifying medical condition that triggered rights under the FMLA.

### b. <u>Notice of His Entitlement to FMLA Leave</u>

The City also argues that, even assuming Blake had a FMLA qualifying condition, it is still entitled to summary judgment because Blake cannot prove that he gave the City notice of his need for FMLA leave.

An employee in need of FMLA leave must provide his employer with notice of the need for leave. *Wai v. Federal Exp. Corp.*, 461 F. App'x 876, 882 (11th Cir. 2012). If the need for leave is foreseeable, the employee must, if practicable, give no less than thirty days' notice before the date leave is to begin. *See* 29 U.S.C. § 2612(e)(2)(B); 29 C.F.R. § 825.302(a). If it is unforeseeable, notice to the employer must be given "as soon as practicable under the facts and circumstances of the particular case." *See* 29 C.F.R. § 825.303(a).

17

The Eleventh Circuit has held that "where an employee's need for FMLA leave is unforeseeable, the employee need only provide her employer with notice sufficient to make her employer aware that her absence is due to a potentially FMLA-qualifying reason." *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005) (citation omitted).[4] Whether the employee believes his request for leave is FMLA qualifying is irrelevant because the burden is on the employer to determine whether an employee's request for leave falls within the FMLA. *Cooper v. Gulfcoast Jewish Family Servs., Inc.*, No. 8:09-CV-787-T-30TBM, 2010 WL 2136505, at *6 (M.D. Fla. May 27, 2010) (citing 29 C.F.R. § 825.302(c) ("In all cases, the employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken.")). Further, the FMLA "does not contemplate allowing employers to benefit from their employee's lack of

_____

[4] Blake's opposition brief does not discuss the theory, though his supplemental brief obliquely alludes to it, but as far as the Court can determine, the Eleventh Circuit has not directly held that constructive notice can trigger an employer's responsibilities under the FMLA. *See, cf.*, *Smith v. Constr. Datafax, Inc*., 871 F. Supp. 2d 1226, 1234 (N.D. Ala. 2012) (citing *Stevenson v. Hyre Elec. Co*., 505 F.3d 720, 726 (7th Cir. 2007) ("Whether planned or unplanned, an employee's right to take FMLA leave is conditioned on the provision of actual or constructive notice to the employer.")); *Wahl v. Seacoast Banking Corp. of Fla*., No. 09-81382-CIV, 2011 WL 861129, at *5 (S.D. Fla. Mar. 9, 2011) (same). The Court will demur from being so innovative, and from making legal arguments for Blake that were not adequately developed by his counsel.

knowledge about their FMLA rights." *Beveridge v. HD Supply Waterworks, L.T.D.*, No. 7:08-cv-52-HL, 2009 WL 4755370, at *10 (M.D. Ga. Dec. 7, 2009) (citing *Nasbaum v. CB Richard Ellis, Inc*., 171 F.Supp.2d 377, 381 (D.N.J. 2001)).

While "an employee requesting FMLA leave need not expressly mention the Act, [he] must provide notice sufficient to make the employer aware of both the need for qualifying leave and its anticipated timing and duration." *Crawford v. City of Tampa*, 464 F. App'x 856, 858 (11th Cir. 2012) (citations omitted). To give sufficient notice, the plaintiff must inform the employer "of a potentially FMLA-qualifying reason for [his] absence." *Id.* (citing *Cruz*, 428 F.3d at 1386). And "[a]bsent unusual circumstances, an employee must also comply with an employer's usual and customary notice and procedural requirements for requesting leave." *Id.* at 858–59 (internal quotation marks omitted).

Whether the notice given is sufficient for FMLA purposes is a mixed question of fact and law, with the factfinder determining what notice was given and the court deciding whether such notice was legally sufficient. *Cooper v. Walker Cty. E-911*, No. 6:16-CV-1746-TMP, 2018 WL 3585217, at *15 (N.D. Ala. July 26, 2018); *Shelton v. Price Waterhouse Coopers, LLP*, No. 8:12-CV-02757-T-27, 2014 WL 2581348, at *4 (M.D. Fla. May 2, 2014); *see Strickland*, 239 F.3d at 1208. "For summary judgment purposes, therefore, the appropriate inquiry is whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has complied with

the FMLA's notice requirements as a matter of law." *Id.* (citing *York v. AK Steel Corp.*, No. C–1–04–250, 2005 WL 3338696, at \*5 (S.D. Ohio Dec. 8, 2005)). Importantly, the FMLA does not require employers to engage in "intrusive inquiries" to determine whether FMLA Act applies. *Andrews v. CSX Transp., Inc.*, 737 F. Supp. 2d 1342, 1351 (M.D. Fla. 2010) (citation omitted). "[T]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1435 (11th Cir. 1997) (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995)).

In the light most favorable to Blake, as the Court must view the evidence, it is clear that Blake never made a request for, of even inferred, temporary leave of any sort, let alone any leave due to a medical condition.  Instead, even by his own admission, Blake told the City that he intended to resign; that is, leave his employment permanently.  Blake's later discussion with Chief Hackett on August 22 does not change the significance or import of their earlier discussion because, again, Blake voiced no intent or desire to take a temporary leave of absence.  Instead, Blake's later discussion with Chief Hackett only confirmed their initial conversation about Blake's resignation, save the detail that Blake wanted to speak with his wife.

In his brief, Blake argues that the City had "sufficient notice of the detrimental effect of 48-hour shifts" on paramedics and therefore the City should have been

aware of Blake's mental fatigue.  (Doc. 33 at 14.)  Thus, according to Blake, the City should have recognized Blake as having a FMLA qualifying condition, should have rejected his resignation, and should have placed Blake on FMLA leave without any request by Blake to do so.  But again, the problem with this argument is that Blake never asked for, nor sought leave in any form. *See Andrews*, 737 F. Supp. 2d at 1351 ("The FMLA does not require that an employee give notice of a desire to invoke the FMLA. Rather, it requires that the employee give notice of *need* for FMLA leave.") (emphasis in original). Instead, Blake's statements to the City voiced the opposite; that is, that he was resigning.  The City was under no obligation, legal or otherwise, to ignore Blake's statements about his resignation and act contrary to his request.

Simply put, FMLA liability cannot be predicated on such a scenario.  Indeed, courts have granted summary dismissals in FMLA cases involving similar claims of stress and job burnout where the employee failed to directly ask for FMLA leave. *See, e.g., Maitland*, 2006 WL 3090120, at *5, 15-16 (plaintiff's generic statements to employer about being stressed and burned out, wanting time off, and that she was seeking counseling, were insufficient to reasonably apprise the employer of plaintiff's request to take time off for a "serious health condition" as defined by the FMLA) (citing *Gay*, 125 F.3d at 1435); *Lowery v. Strength*, 356 F. App'x 332, 334 (11th Cir. 2009) (insufficient notice); *see also Hurley v. Kent of Naples, Inc.*, 746 F.3d 1161, 1167 (11th Cir. 2014) ("Giving an employer notice of unqualified leave

21

does not trigger the FMLA's protection. Otherwise, the FMLA would apply to every leave request"); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 220 (7th Cir. 2015) (employee's statement, albeit to a subordinate employee, that he was contemplating taking a "medical leave" was insufficient to provide notice to his employer). Here, the facts are even weaker because Blake never asked for time off or leave of any sort. To the contrary—he voiced his intent to resign.

Blake's statements to Hackett that he "couldn't do it anymore," that he would "turn [his] stuff in," and that he needed to speak with his wife to sort this out, simply do not rise to a level sufficient to give the City notice he was experiencing a serious medical condition, let alone a qualifying medical condition, of any sort for which he wanted, needed or should be given FMLA leave. *See Maitland*, 2006 WL 3090120, at *15 (defendant had no reason, under the circumstances, to believe that plaintiff's request for time off related to anything other than the generalized complaints of "stress."). To conclude otherwise not only would require an employer to completely ignore the employee's words and acts but also require an employer to act contrary to the express desires, requests and demands of the employee. "The Act is not intended to 'constitute a trap for employers who fail to divine unspoken (and even unthought) requests for [FMLA] leave.'" *Walthall v. Fulton Cty. Sch. Dist.*, 18 F.Supp.2d 1378, 1383 (N.D. Ga. 1998) (citing *Paasch v. City of Safety Harbor*, 915 F.Supp. 315, 321 (M.D. Fla. 1995)). But that is exactly what Blake is attempting to

22

do here.  The Court declines that invitation.  Accordingly, for this reason also, the City is entitled to summary judgment on Blake's FMLA interference claim.

### c. *Constructive Discharge*

Blake also alleges that the City interfered with his exercise of his FMLA rights by constructively discharging him. (Doc. 33 at 16.) While constructive discharge typically constitutes an adverse employment action analyzed under the retaliation rubric, *see Sutherland v. Glob. Equip. Co*., 789 F. App'x 156, 160 (11th Cir. 2019) (FMLA constructive discharge claim analyzed under retaliation rubric); *Foshee v. Ascension Health-IS, Inc*., 384 F. App'x 890, 891 (11th Cir. 2010) (same), Blake raises it in both the interference context and the retaliation context and furthermore argues that he is not required to demonstrate a causal connection with his discharge. Instead, as Blake argues, the City must show that it discharged him for reasons wholly unrelated to his request for FMLA leave.  (Doc. 33 at 16 (citing  *Spakes v. Broward Cty. Sheriff's Office*, 631 F.3d 1307, 1309 (11th Cir. 2011)).  This claim, whether analyzed as an interference or retaliation claim, fails nonetheless.

 "In order to show constructive discharge, [...] the plaintiff must show that the situation was so intolerable that he had no choice" but to separate from his employment. *See Rowell v. BellSouth Corp*., 433 F.3d 794, 806 (11th Cir. 2005). Under the constructive discharge doctrine, which applies in the FMLA context, *see Foshee*, 384 F. App'x at 892, courts treat an employee's resignation as though the

employer actually fired the employee when the employee is faced with circumstances of discrimination so intolerable that a reasonable person would resign. *Green v. Brennan*, 136 S. Ct. 1769, 1779 (2016); *Pa. State Police v. Suders*, 542 U.S. 129, 141-43 (2004); *see also Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) ("Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.") (quoting *Munday v. Waste Mgmt. of N. Amer., Inc*., 126 F.3d 239, 244 (4th Cir. 1997)). "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Pa. State Police*, 542 U.S. at 141 (citations omitted).

"The threshold for establishing constructive discharge ... is quite high." *Hipp v. Liberty Nat'l Life Ins. Co*., 252 F.3d 1208, 1231 (11th Cir. 2001). The standard is higher than proving, for example, that a hostile work environment existed. *Id*. To demonstrate a constructive discharge occurred, there must have been "pervasive conduct." *Id*. "[D]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Williams v. Russell Corp*., 218 F. Supp. 2d 1283, 1299 (M.D. Ala. 2002) (emphasis added) (internal marks omitted) (quoting *Matvia v. Bald Head Is. Mgmt., Inc*., 259 F.3d 261, 273 (4th Cir. 2001)); *see also*

24

*Jones v. Fitzgerald*, 285 F.3d 705, 716 (8th Cir. 2002) ("Constructive discharge requires considerably more proof than an unpleasant … environment.").

The City argues that it is entitled to summary judgment on this claim because Blake has failed to prove that he was entitled to take FMLA leave and that nothing concerning the circumstances provided any protection under FMLA.  Instead, as the City repeatedly states, Blake "sua sponte resigned" and never withdrew it. (Doc. 42 at 6.)  Blake counters by arguing that the City impermissibly forced his resignation by coercion or duress. (Doc. 33 at 17-18.)  However, the record comes nowhere close to showing a question of fact on a constructive discharge claim.

Instead, the record is clear that Blake's first conversation with Hackett involved nothing more than his voluntary resignation from his position as a paramedic that was spurred by absolutely no urging or pressure by the City, let alone any pressure or intolerable work environment based on a discriminatory basis. *See Slattery v. Neumann*, 200 F. Supp. 2d 1367, 1371 (S.D. Fla. 2002) (citing *Garner v. Wal–Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987) ("an employee has the responsibility to act reasonably before choosing to resign, based on a theory of constructive discharge.")).  Blake even admits it.  (Doc.  29-1 at 82.)  Moreover, during his second phone call with Hackett later that day, Blake chose not to retract his earlier resignation but conditioned his future course with the City on a future discussion with his wife.  *See MacLean v. City of St. Petersburg*, 194 F. Supp. 2d

25

1290, 1303 (M.D. Fla. 2002) (where employee voluntarily resigned from her position, and employer had discretion as to whether to accept her resignation or allow her to rescind it, employee was not entitled to "reinstatement," as required to establish interference claim under FMLA).

Further, Blake fails to make a sufficient showing that his work conditions were intolerable because of an illegal or discriminatory basis. "[I]f the employer deliberately makes an employee's working conditions *so intolerable that the employee is forced into an involuntary resignation*, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee." *Young v. Sw. Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975) (emphasis added).[5]

Here, the alleged intolerable work environment was not one based upon a FMLA protected right or a discriminatory basis, but instead the work conditions and stressors of the type of job Blake held as a paramedic. That was the stated basis for his resignation, as Blake told Hackett, and not because of a serious medical condition or any FMLA-related issues or discrimination. *See Santandreu v. Miami-Dade Cty*., No. 10-24616-CIV, 2011 WL 13136161, at *16 (S.D. Fla. Aug. 1, 2011) (citing

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 273 (4th Cir. 2001) ("difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.")). "[T]he mere fact that [the plaintiff] was forced to choose between two inherently unpleasant alternatives does not in itself mean that his resignation was submitted under duress." *Hargray v. City of Hallandale*, 57 F.3d 1560, 1569 (11th Cir. 1995).

On the record before it, the Court cannot conclude that there is a question of fact on Blake's constructive discharge theory.  Thus, summary judgment is due to be granted to the City on Blake's FMLA constructive discharge claim.

### 2. **FMLA Retaliation- Accepting Blake's Resignation**

According to Blake, the City's decision to accept his resignation, the day after Blake resigned, constitutes prohibited retaliation.  Blake further argues it was retaliation for the City to announce that it was accepting Blake's resignation when it knew that he was burned out and fatigued, that he was having second thoughts, and when the City's internal documentation showed that the City was so concerned about Blake's well-being that it intended to temporarily reassign him and place him in the EAP program.  The City argues that it is entitled to summary judgment on this claim too for the same reasons that it is entitled to summary judgment on Blake's interference claim; that is, because Blake voluntarily resigned and never invoked any FMLA rights.

To prevail on an FMLA retaliation claim, the employee must show "that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Strickland*, 239 F.3d at 1207 (citing *King v. Preferred Technical Grp.*, 166 F.3d 887, 891 (7th Cir. 1999)). This requires either a direct or causal showing that the employer was "motivated by an impermissible retaliatory or discriminatory animus." *Id*.

Blake does not offer any direct evidence that the City was motivated by an impermissible or discriminatory animus. Direct evidence of a discriminatory animus is "evidence, which if believed, proves existence of fact in issue without inference or presumption." *Burrell v. Bd. of Trustees of Georgia Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997) (citing *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n. 6 (11th Cir. 1987) (citing in turn Black's Law Dictionary 413 (5th ed.1979)). As the Eleventh Circuit has held, much more is required to show the blatantly discriminatory nature found in direct evidence. *E.g., Damon v. Fleming Supermarkets Of Fla., Inc*., 196 F.3d 1354, 1359 (11th Cir. 1999) ("'only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age' will constitute direct evidence of discrimination... (a)n example of direct evidence would be a management memorandum saying, 'Fire Earley—he is too old.'") (citing *Earley v. Champion Int'l Corp*., 907 F.2d 1077, 1081–82 (11th Cir. 1990) (citations and quotations omitted)). No evidence presented by Blake is even

close to meeting this rigorous standard. *See Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (Evidence that "only suggests [retaliation] or that is subject to more than one interpretation does not constitute direct evidence.").

In the absence of direct evidence, as is the case here, the Court employs the familiar burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Strickland*, 239 F.3d at 1207. There, a plaintiff must show that (1) he engaged in a statutorily protected activity; (2) he experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *Daugherty v. Mikart, Inc.*, 205 F. App'x 826, 827 (11th Cir. 2006) (quoting *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006)).

The causal connection element is also satisfied if a plaintiff shows that the protected activity and adverse action were "not wholly unrelated." *Brungart v. BellSouth Telecommunications. Inc.*, 231 F.3d 791,799 (11th Cir. 2000) (citing *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999)). Generally, a plaintiff can show the two events are not wholly unrelated if there is close temporal proximity between the protected conduct and the termination, and the decisionmaker was aware of the protected conduct at the time of the adverse employment action. *See Brungart,* 231 F.3d at 799; *Clover*, 176 F.3d at 1354. The employer's awareness

of the protected conduct can be established by circumstantial evidence. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

If the employee successfully demonstrates a prima facie case, the burden then shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse action. *See Schaaf v. SmithKline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010). If the employer does so, the plaintiff must then present evidence sufficient to permit a reasonable factfinder to conclude that the reason given by the employer was not the real reason for the adverse employment decision and that it was a pretext for retaliation. *Lee v. U.S. Steel Corp.*, 450 F. App'x 834, 838 (11th Cir. 2012); *Schaaf*, 602 F.3d at 1244.

The gist of Blake's retaliation claim is that he was terminated by the City, under the guise of the City's acceptance of his resignation, after his initial conversation with Hackett, which Blake construes as an exercise of his FMLA rights. Blake contends that he has stated a prima facie case because his statement that he "couldn't do it anymore" was statutorily protected activity and that his separation from employment with the City functioned as his termination. However, Blake's asserted prima facie case of retaliation is fatally flawed for several reasons. To begin, Blake cannot show that he suffered from a FMLA-qualifying condition. *Edwards v. Hyundai Motor Mfg. Alabama, LLC*, 603 F. Supp. 2d 1336, 1354 (M.D. Ala. 2009) ("There can be no doubt that [a] request—made by an ineligible employee for leave

that would begin when she would still have been ineligible—is not protected by the FMLA.") (citing *Walker v. Elmore Cty. Bd. of Educ.*, 379 F.3d 1249, 1252 (11th Cir. 2004)). Nor has he shown that the City was aware that he was exercising his FMLA rights. *See Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010) (company officials who decided to terminate employee were unaware that employee had requested FMLA leave one day before the decision was made to terminate her employment, thus precluding employee's FMLA retaliation claim).

The requirement that an employer must be aware of the protected conduct at the time of the adverse employment action rests upon common sense. *Brungart*, 231 F.3d at 799. It logically follows that "[a] decision maker cannot have been motivated to retaliate by something unknown to him." *Id.*; *see also Clover*, 176 F.3d at 1356 (notwithstanding close temporal proximity between the protected conduct and the termination, summary judgment was warranted on a retaliatory discharge claim because the plaintiff "failed to present sufficient evidence ... that [the decision maker] was aware of her protected conduct."). As the Court discussed in the FMLA interference context, Blake's statements to Hackett were at the most very oblique and vague references to Blake's job fatigue and burnout (much less a FMLA-qualifying condition), which standing alone are insufficient to show that the City was aware that Blake was engaging in protected conduct even if one was to assume that Blake was constructively discharged.

31

In addition, as discussed *supra*, Blake has not shown that his statements to Hackett constituted an exercise of statutorily protected conduct for any other reason. As Blake admitted, they were statements announcing his resignation, which terminated the City's FMLA obligations to him. (Doc. 29-1 at 82.) This constituted "unequivocal notice of intent not to return to work" and terminated any obligation on the part of the Defendants to restore him to his former position. *Walthall v. Fulton Cty. Sch. Dist.*, 18 F. Supp. 2d 1378, 1384 (N.D. Ga. 1998) (citing 29 C.F.R. § 825.309(b); *Paasch*, 915 F.Supp. at 322)). At this point, Blake's FMLA retaliation claim seems to be more of an afterthought. *See id*. at 1384.

And if that were insufficient, Blake has not rebutted the City's stated reason for that claimed employment action; that is, that Blake had resigned and the City was within its every right to accept it.  Blake was the captain of the ship as it concerned his continued employment with the City. He alone decided to depart, and he cannot now complain that the City impermissibly retaliated against him for taking an employment action that Blake *himself* requested.

Thus, summary judgment is due to be GRANTED to the City on Blake's claim for retaliatory discharge.

### 3.  The City's Alleged Due Process Violation

In Count III of his Complaint, Blake brings a due process claim under Section 1983. He alleges that the City deprived him of a pre-termination hearing and further

terminated him, via constructive discharge, without providing notice or an opportunity to be heard, thus violating his due process rights because "he had a property right in his continued employment with the City, and was therefore entitled to the protections of procedural due process afforded by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution," (Doc. 33 at 22-23). The City argues there are no due process implications because Blake voluntarily resigned. (Doc. 30 at 9.) In reply, Blake counters that he did not resign, or alternatively, that his resignation was rescinded under the totality of the circumstances.

It is undisputed that Blake was a merit employee with the City and therefore had a property right in his employment. (Doc. 32-8 at 5-6; Doc. 33 at 1.) *See Powell v. City of Montgomery*, 56 F. Supp. 2d 1328, 1333 (M.D. Ala. 1999), *aff'd*, 245 F.3d 793 (11th Cir. 2000) (recognizing fireman's property interest in employment with the City of Montgomery protected by due process clause). Blake has alleged no more than a deprivation of his city job and therefore has only offered a deprivation of the procedural, not substantive, due process rights he enjoyed as a City employee. *E.g., McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994).

In order to establish a procedural due process violation under 42 U.S.C. § 1983, Blake must show: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).

However, if a person, otherwise entitled to due process, voluntarily resigns from employment, he foregoes any due process protection. *Fetner v. City of Roanoke*, 813 F.2d 1183, 1186 (11th Cir. 1987); *Stewart v. Bailey*, 556 F.2d 281, 285–86 (5th Cir. 1977). A resignation is "[t]he act or an instance of surrendering or relinquishing an office, right, or claim. [It is a] formal notification of relinquishing an office or position." *Diaz v. City of Pahokee, Fla*., No. 09-80305-CIV-ZLOCH, 2009 WL 1124979, at *2 (S.D. Fla. Apr. 27, 2009) (citing Black's Law Dictionary 1311 (7th ed. 1999)). "In other words to resign means '[t]o give up (a position), esp. by formal notification; quit.... To give up one's job or office; quit, esp. by formal notification.'" *Id*. (citing The Am. Heritage Dictionary 1051 (1985)).

The question here is not whether Blake was terminated, but whether he voluntarily resigned. In the Eleventh Circuit, employee resignations are presumed to be voluntary. *Hargray*, 57 F.3d at 1568. The Eleventh Circuit recognizes two circumstances under which an employee's resignation may be deemed involuntary: (1) where the employer forces the resignation by coercion or duress or (2) where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee. *Rodriguez v. City of Doral*, 863 F.3d 1343, 1352 (11th Cir. 2017); *MacLean v. City of St. Petersburg*, 194 F.Supp.2d 1290, 1299–30 (M.D. Fla. 2002) (citations omitted).

"Under *Hargray*, if a plaintiff seeks to show that he was forced to resign by coercion or duress, a court must decide if, under the totality of the circumstances, the employer's conduct in obtaining the resignation deprived the employee of free will in choosing to resign." *Hughes v. Alabama Dep't of Pub. Safety*, 994 F. Supp. 1395, 1405 (M.D. Ala.), *aff'd sub nom. Hughes v. AL Dep't of Pub. Safety*, 166 F.3d 353 (11th Cir. 1998) (citing *Hargray*, *supra*, at 1568). The Eleventh Circuit has applied five factors to analyze whether an employee was forced to resign by coercion or duress: "(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel." *Hargray*, 57 F.3d at 1568. These factors, "although not dispositive," guide the determination of whether Blake's resignation was obtained by coercion or duress, and therefore was involuntary, under the totality of the circumstances. *Hargray*, 57 F.3d at 1568.

As the Court previously discussed in the context of Blake's FMLA constructive discharge claim, "the mere fact that the choice is between comparably unpleasant alternatives ... does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary." *Hargray*, 57 F.3d at 1568 (citing *Stone*, 855 F.2d at 174); *see also Slattery*, 200 F. Supp. 2d at 1375 (where employee

resigned to avoid the "loss of prestige he subjectively associated with being relegated to a 'desk job' and not because of any objectively intolerable working conditions," the reassignment to a job that he "considered relatively meaningless" did not constitute involuntary resignation).

Here, Blake has not shown with any evidence that his resignation was forced under coercion or duress.  Blake did not face a different alternative to resignation—on the contrary, his alternative was simply completing his shift assignments and keeping his job. Further, he understood that telling his employer that he was turning in his gear meant resignation, (Doc. 29-1 at 82), and he even had time later in the day to rescind his resignation if he desired, (Doc. 29-1 at 67).[6]  There is simply no element of coercion or duress present whatsoever surrounding Blake's decision to voluntarily, and unprompted, tender his resignation to Hackett on August 22, 2018. "Resignations obtained in cases where an employee is faced with ... unpleasant alternatives are nevertheless voluntary because 'the fact remains that plaintiff had a choice. [Plaintiff] could stand pat and fight.'" *Spechler v. Tobin*, 591 F. Supp. 2d 1350, 1358 (S.D. Fla. 2008), *aff'd*, 327 F. App'x 870 (11th Cir. 2009) (citing *Hargray*, 57 F.3d at 1568)). But Blake "put up no fight at all." *Id.* (citing *Slattery,* 200 F.Supp.2d at 1371 (an employee must "act reasonably before choosing to

---

[6] Due to the nature of Blake's on-the-spot resignation, the other factors mentioned in *Hargray* are inapplicable.

resign," and such "[r]easonable conduct involves notifying the employer of improper behavior, and affording the employer an opportunity to correct the situation."); *cf. Poindexter v. Dep't of Human Res.*, 946 F. Supp. 2d 1278, 1286-87 (M.D. Ala. 2013) (denying summary judgment on coercion theory when plaintiff was told that her conduct constituted a crime, that she needed to make a decision as soon as possible, and that while she could talk to a lawyer, the evidence against her was "overwhelming").

The same result must be reached as it concerns any argument by Blake that his resignation was the result of misrepresentation or deception.   Indeed, Blake advances no misrepresentation or statement by the City that coerced or led to his statements to Hackett that he "couldn't do it anymore" and that he "would turn [his] stuff in."    In short, Blake cannot claim that his resignation was compelled by anything the City said or represented.

Whether Blake may have rescinded his resignation is a murkier issue. This is because neither party adequately addresses whether Blake did, in fact, effectively rescind his resignation prior to its acceptance by Chief Bozeman. *See, e.g., Camacho-Morales v. Caldero*, 68 F. Supp. 3d 261, 294 (D.P.R. 2014). State law controls an employee's right to rescind his resignation. In Alabama, resignations of public employment that are given immediate effect are irrevocable, but a prospective or contingent resignation may be withdrawn at any time prior to its acceptance or its

effective date. *See Ex parte Rhea,* 426 So. 2d 838, 840 (Ala. 1982) (citing *State v. Fowler*, 48 So. 985, 986 (1909)); *City of Dothan v. Lucas*, 254 So. 2d 341, 349-50 (Ala. Civ. App. 1971) (plaintiff tendered resignation to be made effective on a future date, and withdrew it prior to its effective date and without the appointing authority's acceptance, making it validly withdrawn, whereas, "(h)ad [the plaintiff] resigned effective immediately, and there had been acceptance by the proper authorities, there would have been a binding resignation at that time."); *see also Monahan v. Romney*, No. 06CV10921-NG, 2009 WL 10694327, at *8 (D. Mass. Sept. 3, 2009), *aff'd*, 625 F.3d 42 (1st Cir. 2010) (similar due process inquiry regarding whether state official's oral resignation was effective upon acceptance and could not subsequently be withdrawn under Massachusetts law). "An unconditional resignation of a public office, [given] to take effect immediately, cannot be withdrawn, even with the consent of the power authorized to accept it, and it does not seem to be material that the resignation had not been accepted." *State v. Fowler,* 48 So. 985, 986 (Ala. 1909) (citation omitted); *see also Lucas*, 254 So.2d at 348.

Blake's failure to adequately argue the rescission question is fatal to his due process claim. Besides a passing reference to the assertion that "(u)nder the totality of the circumstances, Lt. Blake had not resigned, and even if so, he had rescinded this when speaking with Chief Hackett later that same day," (Doc. 33 at 23), Blake makes no other argument as to the rescission question. The Court is not obligated to

make arguments on Blake's behalf that were not adequately developed in Blake's opposition brief. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it"); *Bowden ex rel. Bowden v. Wal–Mart Stores, Inc.*, 124 F.Supp.2d 1228, 1236 (M.D. Ala. 2000) ("[i]t is not for the court to manufacture arguments on Plaintiff's behalf.").

But even if Blake had adequately argued the issue, he has failed to demonstrate a question of fact as to whether he rescinded his resignation.  In attempting to do so, Blake cites to the inconsistencies between Hackett's statement that he was not past the point of no return and Chief Bozeman's statement that the City was accepting his resignation. While these two conversations are not entirely consistent in substance, Blake overlooks their shared attribute. Namely, neither statement is founded upon any misrepresentation, nor is any other statement upon which Blake alleges he relied.  Indeed, nowhere does Blake provide evidence that anything the City said or did precluded him from rescinding his resignation during his conversations with Hackett.  When he spoke with Chief Bozeman who informed him that the City was accepting his resignation, Blake did not challenge, rebut or disagree with Chief Bozeman.  Instead, he responded with "10-4 Chief."  Again, Blake was in control of his future with the City up to the point that Chief Bozeman accepted his resignation. From this chain of events, the Court finds there is no

question of fact on any claim that there has been a violation of Blake's procedure

due process rights, especially when the course of events was voluntarily initiated by

Blake.

Therefore, the City's motion for summary judgment is due to be GRANTED

as to Count III of Blake's Complaint.

## V.     CONCLUSION

Accordingly, it is

ORDERED the City's Motion for Summary Judgment (Doc. 29) be and is

hereby GRANTED.

**DONE** and **ORDERED** this 6th day of October, 2020.

    /s/ R. Austin Huffaker, Jr.    

R. AUSTIN HUFFAKER, JR.

UNITED STATES DISTRICT JUDGE
